IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | **ORDER DENYING DEFENDANT'S** |
| ) | **MOTION FOR NEW TRIAL** |
| vs. ) | |
| ) | Case No. 1:19-cr-031 |
| Terrell Jason Armstrong, ) | |
| ) | |
| Defendant. ) | |

Before the Court is the Defendant's *pro se* motion for new trial filed on September 18, 2023. See Doc. No. 344. The Government filed a response in opposition to the motion on October 2, 2023. See Doc. No. 348. The Defendant filed a reply brief on October 23, 2023. See Doc. No. 352. For the reasons explained below, the motion is denied.

I.     **BACKGROUND**

In late 2018 and early 2019, Detective Jeremy Seeklander with the Bismarck Police Department began to receive information about two men from the Minneapolis-St. Paul, Minnesota, area dealing large quantities of methamphetamine and heroin in the Bismarck/Mandan, North Dakota, area. The information suggested that the two men involved had went by the names "Dre" and "Louis." In mid-to-late December 2018, an informant/co-defendant (Burt Robillard) provided Detective Seeklander a license plate number related to "Dre" to. Detective Seeklander ran the plate and the vehicle came back to the registered owner, Danae Mansell. Detective Seeklander passed that information along to other law enforcement agents. Law enforcement received additional information from other cooperators (including Tia Klein) that "Dre" and "Louis" frequently stayed at the Ramkota Hotel and Motel 6 in Bismarck while conducting their drug trafficking. Detective

Seeklander would later learn the true identities of "Louis" and "Dre" to be Terrell Armstrong and Danae Mansell, respectively.

As the investigation began to unfold, law enforcement would learn the drug trafficking conspiracy dated back to 2015 when Armstrong came to know Gorgianna Hepperle and Agnes Reddogg. Armstrong provided Reddogg with methamphetamine to use and resell, with proceeds being returned to him. Reddogg was arrested and imprisoned, but once back in the community, she quickly fell back into selling methamphetamine for Armstrong. Armstrong would introduce others to Reddogg, including Danae Mansell, and instructed Reddogg to deal with these individuals as if they were him. Reddogg would continue to work with Armstrong, Mansell, Byron Brown, Christopher Rubio, and others in the conspiracy through the beginning of 2019, helping distribute large quantities of heroin and methamphetamine.

In January 2019, Detective Seeklander received information that Mansell would be traveling to North Dakota. On or about January 16, 2019, law enforcement received information from a confidential informant that Mansell was in Bismarck. This information was provided to patrol officers, who began to check Bismarck hotels for Mansell's red Ford Fusion bearing Minnesota license plates.

On January 19, 2019, Bismarck Police Department patrol officers observed a red Ford Fusion at Motel 6. Officers ran the vehicle information and confirmed the red Ford Fusion in the Motel 6 parking lot was the vehicle law enforcement was attempting to locate. When the red Ford Fusion left the Motel 6 parking lot, officers followed the vehicle and eventually pulled the vehicle over for a traffic violation.

The driver of the vehicle was identified as Deondra Kight and the passenger as Danae Mansell. Kight admitted to having a suspended license and was arrested. Mansell was removed from the vehicle so officers could deploy a canine for a free air sniff. The canine indicated on the vehicle for the odor of controlled substances. A search of the vehicle yielded approximately seven grams of heroin, U.S. currency, and a firearm. A search of Kight and Mansell revealed key cards for the Motel 6. Officers took these keys cards to the Motel 6 and confirmed a room registered to Kight and Mansell. A search warrant was applied for and granted for the Motel 6 hotel room. Execution of the search warrant yielded over three pounds of methamphetamine, 170 grams of heroin, digital scales, a firearm, paperwork belonging to Kight, and cellular phones.

During the same time frame in which North Dakota law enforcement officials were investigating Armstrong, Mansell, and others, the Minneapolis/St. Paul Northwest Metro Task Force ("NWMTF") area, was conducting a parallel investigation of Armstrong. In January 2019, the NWMTF utilized a confidential informant who advised the task force that Armstrong was trafficking methamphetamine and cocaine in the Minneapolis/St. Paul, Minnesota, area. Law enforcement utilized the information from the informant to obtain a pen register trap and trace, which revealed Armstrong making multiple trips to North Dakota, including on January 19, 2019. Co-conspirators would corroborate this information, indicating they received controlled substances from Armstrong, and despite Mansell's arrest, Armstrong would continue to traffic controlled substances.

The NWMTF continued their investigation through surveillance and obtaining a search warrant for Armstrong's residence. In April 2019, prior to obtaining the search warrant, law enforcement discovered the following items discarded in Armstrong's curbside garbage: two .45 automatic handgun training rounds; mail for Yazaunie Vanderbilt (Armstrong's girlfriend) addressed

to a residence in Grand Forks, North Dakota; a U.S. Bank receipt for a $500 cash deposit; a money order receipt for $600; a THC vape cartridge; a THC package from California labeled 91.47 THC; and plastic wrap that was ion scanned and tested positive for methamphetamine. A search warrant was obtained for Armstrong's residence from the Dakota County District Court, Minnesota. A search of Armstrong's residence yielded firearms, ammunition, over $66,000 U.S. currency, and additional evidence. An investigator briefly spoke with Armstrong during the search who stated he was employed at Top Dog Automotive, however, law enforcement was not able to find records to establish the existence of that business.

In February 2019, North Dakota law enforcement received information, from a source who wished to remain anonymous, that led them to the Quality Inn hotel in Bismarck. Upon review of the hotel registration, one name stood out, that being Gorgianna Hepperle. Hepperle's name was significant because law enforcement knew Hepperle to have ties to Agnes Reddogg. Law enforcement knew Reddogg to be involved with the long-term drug trafficking investigation. Furthermore, law enforcement had obtained a pen register trap and trace warrant for Reddogg and found that she had traveled to and from the Quality Inn hotel.

Hepperle was under the supervision of the North Dakota Parole and Probation. The terms and conditions of Hepperle's probation included a search clause. A probation search was conducted on Hepperle's hotel room at the Quality Inn. When law enforcement agents knocked on the door of the room registered to Hepperle, a black male, later identified as Byron Brown, answered the door. He immediately became combative with law enforcement. Due to the exigency, officers entered the hotel room and observed a backpack sitting on a chair next to the couch that was unzipped and contained a large sandwich bag of methamphetamine in excess of a quarter pound and a smaller

plastic baggy that contained approximately one ounce of heroin. A search warrant was subsequently applied for and granted.

Law enforcement returned to the hotel room and executed the search warrant. That search yielded cellular phones, a digital scale with methamphetamine residue, approximately three pounds of methamphetamine, 37 grams of heroin, a large amount of U.S. currency, and zip lock bags. Co-conspirators would corroborate the controlled substances located during this search to be tied to Armstrong.

On June 5 2019, Armstrong, Mansell, Kight, Brown, and Robillard were charged in a superseding indictment in federal court in North Dakota. Armstrong was charged with one count of conspiracy to possess with intent to distribute and distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(l), 846, and 18 U.S.C. § 2 (Count One). The superseding indictment alleged Armstrong and others were responsible for trafficking large quantities of methamphetamine and heroin from the Minneapolis/St. Paul, Minnesota, area to the Bismarck/Mandan, North Dakota, area.

In October of 2019, Reddog was charged federally in a separate but related indictment in the District of North Dakota. <u>See</u> <u>United States v. Reddog</u>, No. 1:19-cr-187. Eventually, Reddog, Mansell, Kight, Brown, and Robillard all pled guilty. Armstrong took his case to trial in September 2020.

Numerous co-conspirators testified throughout Armstrong's trial including Agnes Reddogg, Tia Klein, Gorgianna Hepperle, Burt Robillard, Amanda Backman, Deondra Kight, and Christopher Rubio and gave corroborating accounts of the drug conspiracy lead by Armstrong. Each of these individuals would describe their involvement in the drug trafficking with Armstrong, whom most knew as "Louis." The co-conspirators described either receiving controlled substances directly from

Armstrong and/or observing Armstrong with significant quantities of controlled substances. Many of those co-conspirators also described making multiple trips to/from North Dakota and Minnesota for purposes of furthering drug trafficking, with proceeds of those drug trafficking sales being returned to Armstrong.

On September 18, 2020, after a four-day trial and three hours of deliberation, a jury found Armstrong guilty of the charged conspiracy. On January 26, 2021, after finding a total offense level of 40, criminal history category of III, with a guideline imprisonment range of 360-months to life, the Court sentenced Armstrong to 264-months of imprisonment. Armstrong appealed. On July 13, 2022, the Eighth Circuit Court of Appeals affirmed the sentence and conviction. United States v. Armstrong, 39 F.4th 1053 (8th Cir. 2022). The current motion for a new trial was filed on September 18, 2023.

## II.     LEGAL DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure allows a defendant to receive a new trial if there is newly discovered evidence or any other reason if justice so requires. The Eighth Circuit has described a district court's discretion in granting a new trial as follows:

> Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The district court has broad, but limited, discretion to grant or deny a motion for a new trial based on the sufficiency of the evidence, and 'it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" United States v. Aguilera, 625 F.3d 482, 486 (8th Cir. 2010) (quoting United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002)). But "[m]otions for new trial based on the sufficiency of the evidence are generally disfavored, . . . and '[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand.'" Id. at 487 (last alteration in original) (quoting Campos, 306 F.3d at 579).

United States v. Vega, 676 F.3d 708, 722 (8th Cir. 2012).

The Eighth Circuit has also explained, "[a] district court may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." United States v. McClellon, 578 F.3d 846, 857 (8th Cir. 2009) (quoting United States v. Starr, 533 F.3d 985, 999 (8th Cir. 2008)). A trial court has broad discretion in deciding whether to grant a motion for a new trial. United States v. Walker, 393 F.3d 842, 848 (8th Cir. 2005) (citing United States v. Red Elk, 368 F.3d 1047, 1053 (8th Cir. 2004)). The Eighth Circuit has made it clear that motions for a new trial are generally disfavored and are to be granted only where a serious miscarriage of justice may have occurred. United States v. Rice, 449 F.3d 887, 893 (8th Cir. 2006).

There are four factors which must ordinarily be met to justify the grant of a new trial on the grounds of newly discovered evidence: "(1) the evidence must have been unknown or unavailable to the defendant at the time of trial; (2) the defendant must have been duly diligent in attempting to uncover it; (3) the newly discovered evidence must be material; and (4) the newly discovered evidence must be such that its emergence probably will result in an acquittal upon retrial." United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007). A motion for a new trial based upon any other grounds must be filed within 14 days after the verdict. Fed. R. Crim. P. 33(b)(2).

The Eighth Circuit "view[s] with suspicion motions for new trial based on the recantation of a material witness because '[t]he stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.'" United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) (quoting United States v. Grey Bear, 116 F.3d 349, 350 (8th Cir. 1997)). "When the claim of newly discovered evidence is based on a recantation, the district court must first determine whether the

7

recantation is credible." Rouse, 410 F.3d at 1009.  The question "is not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it" although if the district court does not believe the recantation, "it seems most unlikely that . . . the witness's testimony would probably produce an acquittal at a new trial." Grey Bear, 116 F.3d at 350-51.

In this case, the alleged newly discovered evidence comes in the form of an affidavit from Agnes Reddogg in which she claims her testimony was "fabricated" due to pressure from the lead investigator, Bismarck Police Detective Jeremy Seeklander, and the prosecutor.  In other words, Armstrong's motion alleges the United States elicited perjured testimony from Reddogg.  The "newly discovered evidence" is essentially the recantation of Reddogg's trial testimony.

The record at trial demonstrates Reddogg was cross-examined by Armstrong's defense counsel regarding the veracity of Reddogg's testimony, her lengthy criminal history, cooperation with the United States, and the overall credibility of Reddogg.  See Doc. No. 316, pp. 85-99.  Reddogg was specifically questioned regarding her contacts with Armstrong and her motivations to lie to get herself out of trouble.  See Doc. No. 316, pp. 87-95.  Reddogg was also questioned about her meetings with Detective Seeklander and the prosecutor and testified she was not bolstering her testimony.  See Doc. No. 316, p. 84.  Reddog was specifically asked whether she was simply saying what the United States wanted Reddogg to say to which Reddogg stated: "I'm telling you the truth because that's what you do want to hear, so if that's what you want to hear, then, yes." See Doc. No. 316, p. 84

Six cooperators (Tia Klein, Gorgianna Hepperle, Burt Robillard, Amanda Backman, Deondra Kight, Christopher Rubio) testified, providing corroborating details to events that Reddogg was not

8

privy to. Additionally, Reddogg's cellular phone was seized and analyzed. See Doc. No. 261-3, Exhibits 68 and 70. The contents of her phone were presented to the jury and corroborated much of her trial testimony. Phones seized from coconspirators having contact with Armstrong and Reddogg also corroborated Reddogg's trial testimony. See Doc. No. 261-3, Exhibits 64-66 (Amanda Backman phone), 86-88 (Kight phone), 90-92 (Christopher Rubio phone), 184-186 (Danae Mansell phone), 187-189 (Byron Brown phone).

The evidence in this case was overwhelming and included the testimony of multiple co-conspirators and cooperators. Corroborating evidence was obtained in the form of phone forensics, pen register trap and trace, phone ping location data, hotel records, search warrant photos, controlled substances seizures, jail calls, and more. See Doc. 261-3. The "newly discovered evidence" outlined by Armstrong in the form of Reddogg's "affidavit" is implausible impeachment evidence at best. The testimony of the other six cooperating individuals was compelling and overwhelming. Even if Reddogg were to testify to the contrary, the overwhelming weight of the evidence would support a guilty verdict.

The Court is very familiar with this case having presided over the trial of Armstrong and sentenced Armstrong and his co-conspirators. The undersigned also presided over Reddogg's guilty plea and sentencing hearings. Now three years after the Armstrong trial, Reddogg has submitted an affidavit which completely contradicts her sworn trial testimony and the testimony of Armstrong's co-conspirators. Reddogg's affidavit also contradicts the factual basis in her plea agreement and the offense conduct in her Presentence Investigation Report. See Doc. No. 21, ¶¶ 3-6. Reddogg did not object to the offense conduct portion of her Presentence Investigation Report. See Doc. No. 39, ¶ 13 in Case No. 1:19-cr-187. The entire record in the Armstrong case and in Reddogg's case

contradicts Reddogg's affidavit. To say the Court is unpersuaded by Reddogg's recantation would be an understatement. The Court concludes the jury at a second trial would not believe such unsupported and uncorroborated testimony from Reddogg and such testimony would be unlikely to result in an acquittal.

### III.    CONCLUSION

Based upon a careful consideration of the evidence presented at trial, and in the exercise of its broad discretion, the Court finds Armstrong is not entitled to a new trial. No miscarriage of justice has occurred and the jury verdict should stand. Accordingly, the motion for a new trial (Doc. No. 344) and motion for hearing (Doc. No. 345) are **DENIED**.

**IT IS SO ORDERED**.

Dated this 9th day of February, 2024.

/s/  Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court