IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR HABEAS RELIEF** |
| | ) | |
| vs. | ) | Case No. 1:19-cr-031 |
| | ) | |
| Terrell Jason Armstrong, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Terrell Jason Armstrong, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 1:23-cv-202 |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before the Court is Defendant's "Motion to Vacate under 28 U.S.C. § 2255" filed on October 6, 2023. See Doc. No. 349. The Government filed a response in opposition to the motion to vacate on November 20, 2023. See Doc. No. 354. The Defendant filed a reply brief on December 27, 2023. See Doc. No. 356. For the reasons outlined below, the motion is denied.

I.   **BACKGROUND**

In late 2018 and early 2019, Detective Jeremy Seeklander with the Bismarck Police Department began to receive information about two men from the Minneapolis-St. Paul, Minnesota, area dealing large quantities of methamphetamine and heroin in the Bismarck/Mandan, North Dakota, area. The information suggested that the two men involved went by the names "Dre" and "Louis." In mid-to-late December 2018, an informant/co-defendant (Burt Robillard) provided Detective

Seeklander a license plate number related to "Dre." Detective Seeklander ran the plate and the vehicle came back to the registered owner, Danae Mansell. Detective Seeklander passed that information along to other law enforcement agents. Law enforcement received additional information from other cooperators (including Tia Klein) that "Dre" and "Louis" frequently stayed at the Ramkota Hotel and Motel 6 in Bismarck while conducting their drug trafficking. Detective Seeklander would later learn the true identities of "Louis" and "Dre" to be Terrell Armstrong and Danae Mansell, respectively.

As the investigation began to unfold, law enforcement would learn the drug trafficking conspiracy dated back to 2015 when Armstrong came to know Gorgianna Hepperle and Agnes Reddogg. Armstrong provided Reddogg with methamphetamine to use and resell, with proceeds being returned to him. Reddogg was arrested and imprisoned, but once back in the community, she quickly fell back into selling methamphetamine for Armstrong. Armstrong would introduce others to Reddogg, including Danae Mansell, and instructed Reddogg to deal with these individuals as if they were him. Reddogg would continue to work with Armstrong, Mansell, Byron Brown, Christopher Rubio, and others in the conspiracy through the beginning of 2019, helping distribute large quantities of heroin and methamphetamine.

In January 2019, Detective Seeklander received information that Mansell would be traveling to North Dakota. On or about January 16, 2019, law enforcement received information from a confidential informant that Mansell was in Bismarck. This information was provided to patrol officers, who began to check Bismarck hotels for Mansell's red Ford Fusion bearing Minnesota license plates.

On January 19, 2019, Bismarck Police Department patrol officers observed a red Ford Fusion at Motel 6. Officers ran the vehicle information and confirmed the red Ford Fusion in the Motel 6

parking lot was the vehicle law enforcement was attempting to locate. When the red Ford Fusion left the Motel 6 parking lot, officers followed the vehicle and eventually pulled the vehicle over for a traffic violation.

The driver of the vehicle was identified as Deondra Kight and the passenger as Danae Mansell. Kight admitted to having a suspended license and was arrested. Mansell was removed from the vehicle so officers could deploy a canine for a free air sniff. The canine indicated on the vehicle for the odor of controlled substances. A search of the vehicle yielded approximately seven grams of heroin, U.S. currency, and a firearm. A search of Kight and Mansell revealed key cards for Motel 6. Officers took these keys cards to the Motel 6 and confirmed a room there was registered to Kight and Mansell. A search warrant was obtained for the Motel 6 hotel room. Execution of the search warrant yielded over three pounds of methamphetamine, 170 grams of heroin, digital scales, a firearm, paperwork belonging to Kight, and cellular phones.

During the same time frame in which North Dakota law enforcement officials were investigating Armstrong, Mansell, and others, the Minneapolis/St. Paul Northwest Metro Task Force ("NWMTF") area, was conducting a parallel investigation of Armstrong. In January 2019, the NWMTF utilized a confidential informant who advised the task force that Armstrong was trafficking methamphetamine and cocaine in the Minneapolis/St. Paul, Minnesota, area. Law enforcement utilized the information from the informant to obtain a pen register trap and trace, which revealed Armstrong making multiple trips to North Dakota, including on January 19, 2019. Co-conspirators would corroborate this information, indicating they received controlled substances from Armstrong, and despite Mansell's arrest, Armstrong would continue to traffic controlled substances.

The NWMTF continued their investigation through surveillance and obtaining a search warrant for Armstrong's residence. In April 2019, prior to obtaining the search warrant, law enforcement discovered the following items discarded in Armstrong's curbside garbage: two .45 automatic handgun training rounds; mail for Yazaunie Vanderbilt (Armstrong's girlfriend) addressed to a residence in Grand Forks, North Dakota; a U.S. Bank receipt for a $500 cash deposit; a money order receipt for $600; a THC vape cartridge; a THC package from California labeled 91.47 THC; and plastic wrap that was ion scanned and tested positive for methamphetamine. A search warrant was obtained for Armstrong's residence from the Dakota County District Court in Minnesota. A search of Armstrong's residence yielded firearms, ammunition, over $66,000 U.S. currency, and additional evidence. An investigator briefly spoke with Armstrong during the search who stated he was employed at Top Dog Automotive, however, law enforcement was not able to find records to establish the existence of that business.

In February 2019, North Dakota law enforcement received information, from a source who wished to remain anonymous, that led them to the Quality Inn hotel in Bismarck. Upon review of the hotel registration, one name stood out, that being Gorgianna Hepperle. Hepperle's name was significant because law enforcement knew Hepperle to have ties to Agnes Reddogg. Law enforcement knew Reddogg to be involved with the long-term drug trafficking investigation. Furthermore, law enforcement had obtained a pen register trap and trace warrant for Reddogg and found that she had traveled to and from the Quality Inn hotel.

Hepperle was under the supervision of the North Dakota Parole and Probation. The terms and conditions of Hepperle's probation included a search clause. A probation search was conducted on Hepperle's hotel room at the Quality Inn. When law enforcement agents knocked on the door of the

room registered to Hepperle, a black male, later identified as Byron Brown, answered the door. He immediately became combative with law enforcement. Due to the exigency, officers entered the hotel room and observed a backpack sitting on a chair next to the couch that was unzipped and contained a large sandwich bag of methamphetamine in excess of a quarter pound and a smaller plastic baggy that contained approximately one ounce of heroin.

A search warrant was subsequently applied for and granted. Law enforcement returned to the Quality Inn hotel room and executed the search warrant. That search yielded cellular phones, a digital scale with methamphetamine residue, approximately three pounds of methamphetamine, 37 grams of heroin, a large amount of U.S. currency, and zip lock bags. Co-conspirators would corroborate the controlled substances located during this search were tied to Armstrong.

On June 5 2019, Armstrong, Mansell, Kight, Brown, and Robillard were charged in a superseding indictment in federal court in North Dakota. Armstrong was charged with one count of conspiracy to possess with intent to distribute and distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2 (Count One). The superseding indictment alleged Armstrong and others were responsible for trafficking large quantities of methamphetamine and heroin from the Minneapolis/St. Paul, Minnesota, area to the Bismarck/Mandan, North Dakota, area.

In October of 2019, Reddog was charged federally in a separate but related indictment in the District of North Dakota. See United States v. Reddog, No. 1:19-cr-187. Eventually, Reddog, Mansell, Kight, Brown, and Robillard all pled guilty. Armstrong's case went to trial in September 2020.

Numerous co-conspirators testified throughout Armstrong's trial including Agnes Reddogg, Tia Klein, Gorgianna Hepperle, Burt Robillard, Amanda Backman, Deondra Kight, and Christopher

Rubio. They gave corroborating accounts of the drug conspiracy lead by Armstrong. Each of these individuals would describe their involvement in the drug trafficking with Armstrong, whom most knew as "Louis." The co-conspirators described either receiving controlled substances directly from Armstrong and/or observing Armstrong with significant quantities of controlled substances. Many of those co-conspirators also described making multiple trips to/from North Dakota and Minnesota for purposes of furthering drug trafficking, with proceeds of those drug trafficking sales being returned to Armstrong.

On September 18, 2020, after a four-day trial and three hours of deliberation, a jury found Armstrong guilty of the charged conspiracy. On January 26, 2021, after finding a total offense level of 40, criminal history category of III, with an advisory Sentencing Guideline range of 360-months to life, the Court sentenced Armstrong to 264-months of imprisonment.

Armstrong appealed. On July 13, 2022, the Eighth Circuit Court of Appeals affirmed the sentence and conviction. United States v. Armstrong, 39 F.4th 1053 (8th Cir. 2022). Armstrong filed a motion for a new trial on September 18, 2023. See Doc. No. 344. The Court denied the motion for a new trial on February 9, 2024. See Doc. No. 357. Armstrong appealed. The Eighth Circuit Court of Appeals summarily affirmed the denial of the motion for a new trial on May 3, 2024. See Doc. No. 364. Armstrong filed the current motion for habeas relief under Section 2255 on October 6, 2023. See Doc. No. 349. The motion has been fully briefed and is now ripe for consideration.

## II.     **STANDARD OF REVIEW**

"28 U.S.C. § 2255 provides a federal prisoner an avenue for relief if his 'sentence was imposed in violation of the Constitution or laws of the United States, or . . . was in excess of the maximum

authorized by law.'" King v. United States, 595 F.3d 844, 852 (8th Cir. 2010) (quoting 28 U.S.C. § 2255(a)). This requires a showing of either constitutional or jurisdictional error, or a "fundamental defect" resulting in a "complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974); Hill v. United States, 368 U.S. 424, 428 (1962). A 28 U.S.C. § 2255 motion is not a substitute for a direct appeal, and is not the proper way to complain about simple trial errors. Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). A 28 U.S.C. § 2255 movant "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). Section 2255 is "intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." Davis, 417 U.S. at 343.

A prisoner is entitled to an evidentiary hearing on a Section 2255 motion unless the motion, files, and records of the case conclusively show that the prisoner is not entitled to relief. 28 U.S.C. § 2255; Engelson v. United States, 86 F.3d 238, 240 (1995). A Section 2255 motion "may be dismissed without hearing if (1) movant's allegation, accepted as true, would not entitle the petitioner to relief, or (2) [the] allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact." See Winters v. United States, 716 F.3d 1098 (2013); see also, Holloway v. United States, 960 F.2d 1348, 1358 (8th Cir. 1992) (a single, self-serving, self-contradicting statement is insufficient to render the motions, files and records of the case inconclusive); Smith v. United States, 618 F.2d 507, 510 (8th Cir. 1980) (mere statement of unsupported conclusions will not suffice to command a hearing).

### III.   LEGAL DISCUSSION

#### A.   INEFFECTIVE ASSISTANCE OF COUNSEL

In his motion, Armstrong contends he received ineffective assistance of counsel when his attorney failed to call two witnesses at trial. The witnesses in question are Robert Williams and Katrina Wells, both of whom have submitted affidavits in support of Armstrong's motion. See Doc. Nos. 353-2 and 353-3.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. To be eligible for habeas relief based on ineffective assistance of counsel, a defendant must satisfy the two-part test announced in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). First, a defendant must establish that defense counsel's representation was constitutionally deficient, which requires a showing that counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. This requires showing that counsel made errors so serious that defense counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Id. at 687-88. In considering whether this showing has been accomplished, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. If the underlying claim (i.e., the alleged deficient performance) would have been rejected, defense counsel's performance is not deficient. Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996). Courts seek to "eliminate the distorting effects of hindsight" by examining defense counsel's performance from counsel's perspective at the time of the alleged error. Id.

Second, it must be demonstrated that defense counsel's performance prejudiced the defense. Strickland, 466 U.S. at 687. In other words, under this second prong, it must be proven that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine

confidence in the outcome." Wiggins v. Smith, 539 U.S. 510, 534 (2003). An increased prison term may constitute prejudice under the *Strickland* standard. Glover v. United States, 531 U.S. 198, 203 (2001).

There is a strong presumption that defense counsel provided "adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690; Vogt v. United States, 88 F.3d 587, 592 (8th Cir. 1996). A court reviewing defense counsel's performance must make every effort to eliminate hindsight and second-guessing. Strickland, 466 U.S. at 689; Schumacher v. Hopkins, 83 F.3d 1034, 1036-37 (8th Cir. 1996). Under the *Strickland* standard, strategic decisions that are made after a thorough investigation of both the law and facts regarding plausible options are virtually unchallengeable. Strickland, 466 U.S. at 690. Strategic decisions and trial strategy are generally entrusted to defense counsel as a matter of professional discretion. United States v. Orr, 636 F.3d 944, 952 (8th Cir. 2011).

When the defendant asserts that there are multiple deficiencies, each claim is reviewed independently. Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006). There is no "cumulative error" rule applied to assistance of counsel claims. United States v. Robinson, 301 F.3d 923, 925 n.3 (8th Cir. 2002).

In this case, Armstrong contends defense counsel was ineffective in failing to call two witnesses who would have testified as to the source of the large amount of U.S. currency recovered by law enforcement in this case. Armstrong submits the unsworn affidavits of Robert Williams and Katrina Wells in support of his motion. See Doc. Nos. 353-2 and 353-3.

Williams states in his affidavit that he is the owner of After Ours Auto LLC, in St. Paul Minnesota. He states he allowed Armstrong to use After Ours Auto's dealer license to purchase cars

at auction in order that Armstrong could start an automotive business of his own. The arrangement called for Armstrong to compensate After Ours Auto for the use of the dealer's license.

Katrina Wells states in her affidavit that in October of 2019, she contracted with Glorious Properties, LLC, a business owned by Armstrong, for the rehabilitation and sale of a home she owned in St. Paul, Minnesota. She states the rehabilitation was completed to her satisfaction and the house was sold in August of 2020. She further states she made all payments due under the contract. The affidavits claim to provide information regarding Armstrong's income and attempts to start a business. However, nothing in those affidavits addresses Armstrong's drug dealings in North Dakota. The affidavits fall short to counter the overwhelming evidence that Armstrong was trafficking substantial quantities of controlled substances into the Bismarck-Mandan communities. Numerous witnesses testified at trial in support of the Government's theory of the case and the affidavits do nothing to undermine their testimony. Even with the information outlined in the affidavits, defense counsel was not ineffective in declining to call either of the potential witnesses because Armstrong's lawful activities in Minnesota do not undermine his drug trafficking activities in North Dakota. Such determinations by defense counsel amount to trial strategy which does not appear unreasonable given the six cooperating witnesses and/or co-conspirators who testified against Armstrong at trial. See Topete v. United States, 173 F. App'x 533, 534 (8th Cir. 2006) (reasonable trial strategy does not constitute ineffective assistance); United States v. Staples, 410 F.3d 484, 488–89 (8th Cir. 2005) (making clear that deciding whether to call a witness is a virtually unchallengeable decision of trial strategy).

Even if this strategy was unreasonable, Armstrong has not shown prejudice. Armstrong must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." Wong v. Belmontes, 558 U.S. 15, 19 (2009) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Strickland, 466 U.S. at 694). That showing requires Armstrong "to establish a reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." Wong, 558 U.S. at 19–20 (cleaned up) (quoting Wiggins v. Smith, 539 U.S. 510, 535-36 (2003)). There must be a substantial, not just conceivable, likelihood of a different result. Purkey v. United States, 729 F.3d 860, 863 (8th Cir. 2013). "To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony "would have probably changed the outcome of the trial." Hadley v. Groose, 97 F.3d 1131, 1135 (8th Cir. 1996) (internal quotations omitted).

Even if the affidavits or testimony of Williams and Wells were provided at trial, Armstrong cannot show the outcome would have been different. The evidence in this case was overwhelming and included testimony from six co-conspirators and/or cooperating individuals and nine law enforcement officers, 200 exhibits including text messages, phone ping data, photographs, and significant quantities of seized controlled substances. Cellular phones from cooperators were seized and analyzed and the contents of which corroborated their testimony and established Armstrong's role in the conspiracy. Nearly all of the co-conspirators testified at trial to knowing Armstrong and his utilizing the moniker Lewis, Louis, Luis or some variation of the name. Two identification cards were seized from Armstrong's residence during the April 2019 search warrants. Those identification cards

depicted a photograph of Armstrong with the name "Armondo Luisito Salzaira." See Doc. No. 348-1, p. 10. These identification cards were entered into evidence at trial as Government's Trial Exhibit 155.

Witness testimony was compelling as well. The testimony of Deondra Kight alone was sufficient to sustain a finding of guilt beyond a reasonable doubt. See Doc. No. 318, pp. 113-83; Trial Tr. Pp. 495-565. Kight testified she trafficked dozens of pounds of methamphetamine through Danae Mansell at the direction of Armstrong. Cell phone ping data further confirmed Armstrong's movements hours before law enforcement seized substantial quantities of controlled substances from Kight and Mansell.

Christopher Rubio testified he was recruited into the drug trafficking conspiracy by Armstrong and acted at the direction of Defendant. See Doc. Nos. 318, pp. 251-311; 319, pp. 26-62; Trial Tr. pp. 633-93, 719-55. Rubio testified that he traveled from Minnesota to North Dakota to deliver several pounds of methamphetamine and hundreds of grams of heroin to various individuals in North Dakota including Amanda Backman, Agnes Reddogg, Elizabeth Rodriguez, Burt Robillard, and others. Rubio also discussed making trips to North Dakota with Danae Mansell and Armstrong. Rubio described the various duties Armstrong entrusted Rubio to conduct including debt collection, product retrieval after Mansell's arrest, watching over downline dealers, and the assault of downline dealers to keep them in place. Rubio also testified to communicating with Armstrong by cell phone to which the contents were discussed before the jury, as well as contents received into evidence. Rubio's phone contents corroborated much of his testimony regarding drug trafficking within the Districts of North Dakota and Minnesota with various individuals, including Armstrong.

In light of the overwhelming testimony from co-conspirators and cooperators and corroborating evidence in the form of phone forensics, cell phone ping data, hotel records, search warrant photos, controlled substances seizures, jail calls, and more, the affidavits from Williams and Wells do little to cast doubt upon the verdict. Armstrong has failed to meet his burden to show how such evidence would have produced a reasonable probability of a different verdict at trial and he fails to meet his burden on either prong of the *Strickland* test.

### B.  REQUEST FOR HEARING

Armstrong has requested the Court hold an evidentiary hearing on his motion. 28 U.S.C. § 2255 provides a hearing is required "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). No hearing is required when the claim is inadequate on its face or if the record, files, and motion conclusively demonstrate the defendant is not entitled to the relief he seeks. Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008). In this case, the record is well-established and the witnesses Armstrong contends should have been called at trial have submitted affidavits for the Court to consider. Even if accepted as true, these affidavits do little to change the overwhelming evidence presented at trial which clearly established Armstrong was the leader of interstate drug distribution network. A careful review of all the materials submitted by the parties, the transcripts, the PSR, and the record as a whole leads the Court to conclude that an evidentiary hearing is unnecessary for a full consideration of the issues raised in the motion.

## IV.  CONCLUSION

The Court has carefully reviewed the entire record, the parties' filings, and the relevant case law. For the reasons set forth above, the Defendant's motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 349) is **DENIED**.  In addition, the Court issues the following **ORDER**:

(1.) The Court certifies that an appeal from the denial of this motion may not be taken in forma pauperis because such a appeal would be frivolous and cannot be taken in good faith.  Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

(2.) Based upon the entire record before the Court, dismissal of the motion is not debatable, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings.  Therefore, a certificate of appealability will not be issued by this Court. Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983). If the defendant desires further review of his motion he may request the issuance of a certificate of appealability by a circuit judge with the Eighth Circuit Court of Appeals.

**IT IS SO ORDERED.**

Dated this 30th day of May, 2024.

/s/ *Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court